**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TOMMIE JOHNSON,

          *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL
SECURITY,

       *Defendant*.

_____/

CASE NO. 5:18-cv-12994

DISTRICT JUDGE JUDITH E. LEVY

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 18)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 15), be **DENIED**, the Commissioner's Motion, (R. 18), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (ECF No. 27), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Title II Disability Insurance Benefits (DIB). The case is presently before the Court upon the parties' cross-motions for summary judgment. (ECF

1

Nos. 15, 18).

Plaintiff filed his present application for DIB on August 31, 2015, alleging that his disability began May 29, 2015. (ECF No. 11, PageID.241.) He then amended his application, modifying the onset date of disability to February 15, 2013. (*Id*. at PageID.245). The application was initially denied. (*Id*. at PageID.170-178). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (*id*. at PageID.199-200), which occurred on October 18, 2017. (*Id*. at PageID.58-74). The ALJ issued a decision on February 2, 2018, finding Plaintiff not disabled during the relevant period. (*Id*. at PageID.42-53). On August 23, 2018, the Appeals Council denied review, (*id*. at PageID.31-33), and Plaintiff filed for judicial review on September 24, 2018. (ECF No. 1). He moved for summary judgment on January 22, 2019 (ECF No. 15), and the Commissioner countered with its own Motion two months later, (ECF No. 18). The case is now ready for resolution.

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

2

(internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that

3

you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her]

4

limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

**D.    ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11 at PageID.42-53.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between the alleged onset date of July 11, 2015 and the date last insured of March 31, 2016. (*Id.* at PageID.48). At step two, the ALJ concluded that Plaintiff had the following severe impairments: "osteoarthritis; end plate spurring at L3-L4; peripheral neuropathy of right lower extremity." (*Id.*). At step three, the ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that "met or medically equaled the severity" of a listed impairment. (*Id.* at PageID.49).

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform "light work as defined in 20 CFR 404.1567(b) except can occasionally climb ramps and stairs." (*Id.* at PageID.50). At step four, the ALJ found Plaintiff could perform his past relevant work as a salesperson because the work "did not require the performance of work-related activities precluded by the claimant's [RFC]." (*Id.* at PageID.53). Thus, the ALJ did not proceed to step five and concluded that Plaintiff was not under disability at any time between July 11, 2015 and March 31, 2016. (*Id.*).

**E.    Administrative Record**

**1.    Medical Evidence**

In December 2012, Plaintiff was hospitalized for "[n]ondependent cocaine abuse,"

5

polysubstance abuse, and chest pain—with the chief complaint being chest pain—and it was noted that he had a "dysmorphic mood," shortness of breath, chest pain, and no leg swelling. (*Id*. at PageID.406-413). His chest x-ray was "normal." (*Id*. at PageID.414). In March 2013, Plaintiff visited Hurley Medical Center with complaints of dental pain; the review of systems indicated a dental problem, but no chest pain or chest tightness and the physical examination indicated that he "does not appear ill," and that he was alert and oriented. (*Id*. at PageID.443-451). Later that month, Plaintiff returned to Hurley Medical Center complaining of a mass on his hip; under the "Review of Systems," all systems were listed as normal, and his physical examination indicated a normal range of motion with tenderness in his right hip, which also exhibited a "baseball size lipomatous growth" with no redness, warmth, or drainage. (*Id*. at PageID.457-458). In May 2013, Plaintiff returned complaining of a laceration on his arm; all other systems were "negative", and the examination flagged no other abnormalities (*Id*. at PageID.466). In January 2014, Plaintiff with complaints of a toothache. (*Id*. at PageID.471).

In December 2014, Plaintiff saw Dr. Uzma Khan at Hamilton Community Health Network for refills on cough medicine, and it was noted in the physical exam that Plaintiff had a ">10 soft non fluctuant fatty tissue/lipoma on left flank, no tenderness." (*Id*. at PageID.393). In June 2015, Plaintiff saw Dr. Donald Robinson because of a tumor on his hip. (*Id*. at PageID.387-388). In the pain assessment, Plaintiff noted his pain was at an eight out of ten but that he did not experience chronic pain. (*Id*. at PageID.387). In the review of systems, it was noted that Plaintiff denied difficulty any breathing at night, chest pain or discomfort, a sense of danger or anxiety, thoughts of violence, frightening visions or

6

sounds, and sleep disturbances due to breathing—but he did complain of joint pain and the large lipoma on the right hip. (*Id*. at PageID.388-389). The physical exam notes indicate that Plaintiff was "well developed, well nourished, in no acute distress," had "normal alignment and mobility" in his extremities, was "alert and cooperative," had "normal mood and affect," and had "normal attention span and cooperation." (*Id*. at PageID.389).

On June 23, 2015, Plaintiff visited Hurley Medical Center complaining of leg pain, which was attributed to his lipoma; his physical was otherwise normal. (*Id*. at PageID.477-478). On July 28, 2015, Plaintiff attended a surgical consultation; the physician noted that he had a "10 year history of a progressively increasing mass right lateral hip that he was told was a fatty tumor but he left it alone and did not have any surgery done" and that it was "becoming to the point where it is interfering with his clothes." (*Id*. at PageID.396). It was noted that the tumor seemed to be "extending posteriorly onto the buttocks and anteriorly onto the anterior lateral thigh." (*Id*.). In the review of systems, it was noted that Plaintiff admitted to right hip pain, limping on his lower right extremity at times, numbness on the side of his thigh, and weakness of his lower right extremity. (*Id*.).

On August 25, 2015, Plaintiff presented with chronic right hip pain, lipoma, and "[u]nspecified essential hypertension;" all systems were negative with the exception of musculoskeletal, which was "[p]ositive for arthralgias," signifying hip pain." (*Id*. at PageID.482-487). The physical exam indicated that he had a normal range of motion but exhibited edema and tenderness; his right hip showed tenderness and deformity, but no swelling. (*Id*. at PageID.486-487). The following day, Plaintiff went to the emergency room presenting with lipoma, benign essential hypertension, and right-sided low back pain

7

with right-sided sciatica. (*Id*. at PageID.495). His systems were all negative with the exception of back pain; he had tenderness in his right hip but normal range of motion and strength. (*Id*. at PageID.499-500).

On February 11, 2016, Plaintiff saw nurse Jennifer Gamble at Dr. Sidney M. Broder's office; the examination found normal strength, reflexes, and gait,[1] and "diminished vibratory sensation" in his right leg; Plaintiff was Plaintiff with paresthesia of skin and pain in his right leg, joint pain, back pain, and muscle weakness. (*Id*. at PageID.511). The physical examination showed that Plaintiff had "normal station and stability; normal inspection, palpation, stability, muscle strength, tone and ROM" for both right and left upper and lower extremities. (*Id*.). Additionally, the neurologic portion of the physical indicated Plaintiff had normal muscle bulk and tone, strength "5/5 throughout," normal sensory exam "with the exception to diminished vibratory sensation RLE [right lower extremity]," and normal gait. (*Id*.). In April, Plaintiff followed up about his right leg pain; the EMG noted bilateral, mild, length dependent functional loss, "mainly demyelinating," and that edema in Plaintiff's lower right extremity "limited both nerve conduction and needle exam." (*Id*. at PageID.509).

On June 9, 2016, Plaintiff underwent a psychiatric assessment with Valerie Harris, who noted that Plaintiff exhibited "moderate" depression and anxiety and that his sleep patterns warranted further evaluation and intervention. (*Id*. at PageID.575-587). In an August psychiatric evaluation, it was noted that Plaintiff had Post Traumatic Stress

---

[1] The notes stated both that he used a cane and had no assistive devices.

Disorder (PTSD), problems relating to social environment, occupational problems, and problems with his primary support group. (*Id*. at PageID.590-599).

In September 2016, Dr. Broder noted that Plaintiff's muscle relaxers had not been well tolerated well and that the swelling around Plaintiff's knee "measured at 42 cm in circumference at the popliteal fossa on the right, compared to approximately 37 to 38 cm on the left." (*Id*. at PageID.506).

In October 2016, Plaintiff was evaluated again by Ms. Harris, who noted Plaintiff presented with depressed mood and increased anxiety, coherent thought process and speech, cooperative attitude, average intelligent, fair-poor judgment, and slept at four hours a night at most. (*Id*. at PageID.620). The pair met again on November 3, and Ms. Harris noted that Plaintiff presented the same way as before and that his mental status was "mostly stable." (*Id*. at PageID.623). The pair met again on December 8, and Ms. Harris noted Plaintiff presented relatively the same as before except for his speech being hyper-verbal at times and his thought content being preoccupied about his pain. (*Id*. at PageID.601). On December 12, 2016, Plaintiff followed up with Dr. Broder, who noted in examination that his condition was "unchanged from his previous evaluation" and scheduled an MRI of Plaintiff's lumbar spine. (*Id*. at PageID.505).

On January 3, 2017, Plaintiff visited Dr. Mohammed Syed, who noted that while all of Plaintiff's other systems were negative, Plaintiff exhibited a "new problem" of back pain but was negative for joint swelling and myalgias. (*Id*. at PageID.550-554). The same day Plaintiff saw Ms. Harris, who noted his mental state remained relatively consistent, but that Plaintiff's sleep was poor. (*Id*. at PageID.604). On January 17, Plaintiff presented to Dr.

Mohammed Syed with back pain and hypertension; the review of systems indicated that with the exception of back pain, all were negative. (*Id*. at PageID.542-549). The physical examination indicated that Plaintiff exhibited no edema, no vertebral tenderness, but a decreased range of motion and tenderness in his lumbar back. (*Id*. at PageID.544). On January 24, Plaintiff visited Ms. Harris, who noted that his mental state was identical to the previous session. (*Id*. at PageID.607). In February 2017, Plaintiff met with Ms. Harris, who noted his mental state was the identical to the previous times except that his motor activity was "not very calm" and that he had been rocking in his chair and moving around the room at times. (*Id*. at PageID.610).

In March 2017, Dr. Syed noted that Plaintiff's back pain and hypertension were "gradually improving since onset;" all systems were negative except for back pain. (*Id*. at PageID.534-541). The following month, Dr. Syed noted again that Plaintiff had back pain and that the back pain and hypertension had been "gradually improving," that the pain was "moderate," and that the current treatment provided "moderate relief." (*Id*. at PageID.529-533).

On April 4, Plaintiff met with Dr. Joshua Nnajil, who noted Plaintiff's panic attacks. (*Id*. at PageID.612). In May 2017, Plaintiff presented with a "new problem" of an upper respiratory infection (URI) as well as back pain and hypertension; the back pain was described as "aching and burning" and had been "gradually improving," while the hypertension was "unchanged" and "uncontrolled." (*Id*. at PageID.524-526). The physical exam showed that he had a decreased range of motion in his lumbar back, tenderness, pain, and spasm; neurologically, he had normal strength and no cranial nerve or sensory deficits.

(*Id*. at PageID.526).

On May 9, Plaintiff met with Ms. Harris, who noted his mental status was "mostly stable," and that his thought content appeared to be preoccupied about "being locked up in jail in April." (*Id*. at PageID.614). The following month, the pair met again, and Ms. Harris noted that Plaintiff exhibited the same mental state. (*Id*. at PageID.616).

Also in June, Plaintiff presented with hypertension, peripheral neuropathy, hyperlipidemia, alopecia, and back pain. (*Id*. at PageID.518). Per the progress notes, the hypertension had been "waxing and waning" and the treatment provided "moderate improvement;" the peripheral neuropathy occurred "every several days," its symptoms were "aggravated by exertion," and the treatment "provided mild relief;" the hyperlipidemia was a chronic, controlled problem; the alopecia had been "waxing and waning" with nothing aggravating its symptoms; the back pain occurred "daily," was "unchanged," and was described at "a severity of 7/10." (*Id*.). On July 20, Plaintiff followed up and presented with alopecia, tinea, and back pain; the tinea occurred daily and had been waxing and waning while the back pain presented in the lumbar spine and remained unchanged. (*Id*. at PageID.513). In August, Dr. Syed filled out a Medical Source by Treating Physician form, diagnosing Plaintiff with chronic back pain and peripheral polyneuropathy; he noted that Plaintiff could not bend, squat, crawl or climb and that Plaintiff could occasionally reach above the shoulders, grasp and hold, perform fine manipulation, and push and pull. (*Id*. at PageID.569). Dr. Syed further opined that Plaintiff could sit, stand, and walk for 0-2 hours out of the workday, lie down or rest for 1-2 hours out of the workday, lift or carry up to 10 pounds frequently. (*Id*.).

11

### 2.      Function Form

On October 8, 2015, Plaintiff completed a function form as part of his DIB application. (*Id.* at PageID.329-336). In it, he claimed disability attributable to a "basketball size tumor" on his right hip, which he noted was "very painful" and made it difficult for him to stand and walk. (*Id.* at PageID.329). He noted he had "no daily activities" and that he "l[aid] in bed all day." (*Id.* at PageID.330). He did not care for other relatives or animals. (*Id.*). Prior to his illness, he was able to stand and walk without pain. (*Id.*). His conditions affected his sleep; when he laid on his right side, it was "very painful." (*Id.*). Regarding personal care, Plaintiff noted his condition made it painful to dress, bathe, care for hair, shave, feed himself, and use the toilet. (*Id.*). He noted he needed no special reminders to take care of personal needs, groom, or take medicine. (*Id.* at PageID.331). He did not prepare his own meals; he noted that his friend cooked and cleaned for him. (*Id.*). He noted he did not do indoor or outdoor chores, and that he would need encouragement to do so. (*Id.*). He noted that his friend did his yard work for him. (*Id.* at PageID.332). He left the house, alone, to attend doctor's appointments "once or twice a month," but he did not drive or shop. (*Id.*). Regarding financial responsibilities, Plaintiff could count change but could not pay bills, handle a savings account, or use a checkbook; his friend paid his bills and Plaintiff did not have a bank account. (*Id.*). His ability to handle money had not changed since the onset of his condition. (*Id.* at PageID.333). Hobbies included watching television, which he noted he did "very well and all day;" he noted he watched more television since his condition began. (*Id.*). He did not spend time with others and did not need anyone to accompany him places. (*Id.*). He had no problems getting along with his family, friends, or

12

neighbors. (*Id*. at PageID.334). He noted he had no social activities affected by the illness and that he did not have activities outside of watching television. (*Id*.).

He wrote that his conditions affected the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks, but not using his hands. (*Id*.). He noted he was "in too much pain to walk or stand" and could only walk a few feet without stopping. (*Id*.). Despite saying he had trouble completing tasks, he also stated he finished what he started and followed instructions "very well." (*Id.*) He noted he got along with authority figures, handled stress, and handled changes in his routine "ok." (*Id*. at PageID.335). He did not use any assistive devices except for a cane, which he needed for standing and walking. (*Id*.).

### 3.   Administrative Hearing

#### a.   Plaintiff Testimony

Plaintiff testified that he had a bachelor's degree in physical education from Central Michigan University, where he played Basketball as a starter; he noted that his subsequent decline in his health was "frustrating." (ECF No. 11 at PageID.61, 69). He explained he did not have a driver's license and that he had not worked anywhere since the amended alleged onset date of July 11, 2015. (*Id*. at PageID.61-62). Plaintiff testified that he sold lawn care door-to-door at his last job at Great Lakes Landcare, where he worked "[m]aybe a couple weeks out of the year" and occasionally helped with lawn care and landscaping when needed. (*Id*. at PageID.62-63). Prior to that, he worked at Customized Personalized Lawn Care and All Green Corporation doing the "same work." (*Id*. at PageID.63-64). At the time of the hearing, Plaintiff had no source of income. (*Id*. at PageID.64). He noted that

the neuropathy in his right leg kept him from working and that he needed to "have it elevated most of the time or it'll swell up pretty bad." (*Id*.). He explained further that he could not lift more than 15 pounds at a time, that he could not walk more than a block without pain, and that his neurologist told him "there's no cure for it." (*Id*.). He took Gabapentin and muscle relaxers to relieve the symptoms—a drug cocktail that Plaintiff noted made him drowsy and caused him to take naps throughout the day. (*Id*.). The neuropathy began after having a "tumor the size of [his] head" removed approximately two and a half years prior, which he claims caused nerve damage and loss of feeling in his right leg. (*Id*. at PageID.64-65). He could not sit or stand for too long, and he usually sat with his right leg propped up to prevent swelling. (*Id*. at PageID.65). He noted that this leg pain was mostly "what ke[pt] [him] from working." (*Id*.).

Plaintiff also noted that he had mental health issues—anxiety, nightmares, and night sweats—stemming from being kidnapped and molested for over a month at the age of twelve. (*Id*. at PageID.66). He had been "working through it" with his psychiatrist and therapist and going through "severe therapy" and taking Klonopin for the anxiety. (*Id*.). He explained that his anxiety and dreams had begun about "three or four years ago" and that due to a lack of insurance, he could not see a therapist for a time. (*Id*.). He usually attended therapy once a week or once every two weeks. (*Id*.).

Plaintiff did not cook or do household chores; his friend had been doing those things for him for "the past few years." (*Id*. at PageID.67). He noted further that had he not met this friend, he would "be living on the street." (*Id*.). During the day, Plaintiff watched television. (*Id*.).

14

Then, responding to his attorney's examination, Plaintiff noted that he had to "stand up periodically and walk around" in order to be comfortable sitting for prolonged amounts of time. (*Id.* at PageID.67-68). He was uncomfortable in the chair he sat in for the hearing and explained he could probably sit in that type of chair for "about 30 minutes at the most." (*Id.* at PageID.68). He spent most of each day with his leg propped up; he explained that if he sat for too long without propping his right leg, it would swell to the point of precluding mobility. (*Id.*). He indicated that due to Gabapentin's side effect of drowsiness, he napped for at least three hours a day. (*Id.*).

He then discussed the tumor that had been removed on his hip; prior to its removal, it had been growing since before 2013 until it got to be "bigger than [his] head." (*Id.* at PageID.69-70). He explained that he attempted to work with the tumor in 2015; he "did as much as [he] could until [he] had to stop" and then "couldn't work anymore." (*Id.* at PageID.70).

Plaintiff had a daughter who was 17 at the time of the hearing. (*Id.*). He was under a child support order until his psychiatrist informed the Family court that Plaintiff was unable to work. (*Id.*).

### b. Vocational Expert Testimony

The ALJ then asked the vocational expert (VE) if there were any modifications to make to Plaintiff's past work, to which she replied: "It does not sound like the lawn service was performed at a substantial amount" but that the sales position would remain for consideration. (*Id.* at PageID.71). The ALJ then asked if someone with Plaintiff's "age, education, and past work, who is able to perform light work, except he can occasionally

climb ramps or stairs" could perform his past work, to which the VE answered, "[y]es."

(*Id*.). The ALJ then presented the VE with another hypothetical:

> Now, if that same person were limited in that he [sic] is further limited that he can perform simple routine tasks in work that has only occasional changes in the work setting and that involves on occasional interaction with the general public, could he perform his past work?

(*Id*. at PageID.71-72). The VE responded that an individual could not perform Plaintiff's

past work under those circumstances but noted there were three other jobs in the national

economy said individual could perform: cleaners, of which there were 900,000 nationally;

sorters, of which there were 210,000 nationally; and packers, of which there were 44,000

nationally. (*Id*. at PageID.72). The ALJ then asked if there were any jobs to accommodate

Plaintiff's limitation of needing to elevate his leg throughout the day, to which the VE

responded "[n]o." (*Id*.).

Under examination by Plaintiff's attorney, the VE was asked if Plaintiff's ability to

sustain any kind of work would be affected by his need to take 15-minute breaks every

hour, to which the VE responded that such a need would be "work preclusive." (*Id*. at

PageID.73). Plaintiff's attorney then presented the VE with the following hypothetical:

> If his ability to accept instructions or respond appropriately to criticisms from supervisors is markedly[2] limited, if his ability to relate to the general public and maintain social appropriate behavior is markedly limited, if his ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes is markedly limited, if his ability to complete instructions and tasks independently is markedly limited, if his ability to maintain attention and concentration for more than brief periods is markedly limited, if his ability to perform production levels expected by most employers is markedly limited, would

---

[2] Plaintiff's attorney clarified that "markedly" in this context meant "greatly decreased ability, ability to the function less than a third of the time." (*Id*. at PageID.73).

that affect his abilities to sustain any kind of work?

(*Id.* at PageID.73). The VE responded, "[y]es, it would be work preclusive." (*Id.*) In closing, Plaintiff's attorney noted that the last hypothetical was "an RFC coming from the psychiatrist." (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The applicable regulations carve the evidence into "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).         Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

17

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight

assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[3] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

### G.   Analysis

Plaintiff presents two arguments, each of which I address in turn.

1.      **Plaintiff's argument that the Commissioner failed to properly consider Plaintiff's mobility and side effects of his medication**

Plaintiff's first argument is that the ALJ's RFC for light work was unsupported by substantial evidence because the ALJ failed to properly consider Plaintiff's "well-documented limitations" resulting from his leg pain and neuropathy. (ECF No. 15 at PageID.650). Specifically, Plaintiff notes that the impairments limit his ability to walk more than a block before experiencing "severe leg pain," his ability to stand for "very long," and his ability to "sit for more than 30 minutes at a time." (*Id*. at PageID.651). Further, Plaintiff notes that he lies down and elevates his leg due to swelling "at least 50% of the day," and needs to nap throughout the day for "at least three hours" due to the drowsiness caused by his medication." (*Id*.). Plaintiff argues that these impairments preclude his capacity to perform "light work," which "requires a good deal of walking or standing" (20 C.F.R. 404.1567). (*Id*.).

The description of "light work" in 20 C.F.R. 404.1567 is more expansive and inclusive than what Plaintiff emphasized: it includes "some pushing and pulling of arm *or* leg controls," "lifting *no more than* 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." (*Id*. (emphasis added)). At the hearing, Plaintiff estimated he could lift up to 15 pounds—which means he could still lift the requisite amount to satisfy "light work" and could probably alternate between sitting and standing. (*See* ECF No.11 at PageID.64).

Moreover, Plaintiff is incorrect in concluding that the ALJ failed to properly consider these impairments, especially Plaintiff's subjective complaints of the pain. The

ALJ acknowledged that Plaintiff's ailments "revolve most around chronic right leg pain." (ECF No.11 at PageID.50). The ALJ cited Plaintiff's own testimony, and noted further that Plaintiff had the tumor removed, that his pain is treated with medication, and that Plaintiff will likely "experience pain for the rest of his life." (*Id.*). The ALJ considered the emergency room and neurology visits and noted that Plaintiff's musculoskeletal and neurological examinations were overwhelmingly "unremarkable." (*Id.* at PageID.51). This conclusion is consistent with the medical records. (*Id.* at PageID.389, 477, 505, 509, 513).

Finally, as Defendant correctly points out, the relevant time frame in this case is small: July 11, 2015 to March 30, 2016. (ECF No. 18, PageID.53). It appears she did consider all the information relevant to this time frame and even information after the relevant time frame, including the medical opinions of Dr. Syed and Dr. Nnanji from 2017.

### 2. Plaintiff's argument that the ALJ lacked authority under the Appointments Clause

Plaintiff argues that his claim should be remanded for a *de novo* administrative hearing with a different ALJ pursuant the Supreme Court's recent ruling in *Lucia v. SEC* and the Sixth Circuit's recent ruling in *Jones Brothers, Inc.* v. *Sec'y of Labor.* (ECF No. 15 at PageID.655); 138 S. Ct. 2004; 898 F.3d at 671. In *Lucia*, the Supreme Court held that SEC ALJs were Officers of the United States—meaning their appointment had to be done by the President subject to the Appointments Clause rather than by the SEC. 138 S. Ct. 2004. In *Jones Bros.*, the Sixth Circuit held that ALJs of the Mine Safety and Health Administration were similarly inferior officers and remanded the case to another ALJ. 898 F.3d at 671. Plaintiff asserts that, because of the rulings in these cases, the ALJ here was

improperly appointed and that he deserves a remand as a consequence. (ECF No. 15 at PageID.661).

Even assuming, *arguendo*, that the rulings in *Lucia* and *Jones Bros.* extend to ALJs of the Social Security administration, Plaintiff's constitutional challenge here should be dismissed because it was not timely: the Court in *Lucia* specifically noted that a party must make "a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case" to be entitled to relief. 138 S. Ct. at 2055 (emphasis added). Per *United States v. L.A. Tucker Truck Lines, Inc.*, parties must raise statutory defects in the appointment of the official who issued the agency's decision prior decision. 344 U.S. 33, 38 (1952). More recently, the Supreme Court has held that Plaintiffs are required to exhaust their constitutional claims to the administrative agency prior to seeking relief through federal court. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012). Plaintiff waited until filing a Motion for Summary Judgement (ECF No. 15) to raise an objection to the administrative decision on constitutional grounds. Despite the recent rulings in *Jones Bros.* and *Lucia*, Plaintiff's complaint is not timely and is therefore without merit.

Furthermore, this court has heard a similar case since both *Jones Bros.* and *Lucia* rulings and come to the same conclusion. *Gothard v. Comm'r of Soc. Sec.*, 2018 WL 7254254 (E.D. Mich., Oct. 10, 2018), *rep. & rec. adopted by* 2019 WL 396785 (E.D. Mich. Jan. 31, 2019). For the above reasons, I am unpersuaded by Plaintiff's Appointments Clause claim because it is now moot and should have been raised with the agency.

## H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision.

Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 15), **GRANTING** the Commissioner's Motion, (ECF No. 18), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  December 13, 2019                S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 13, 2019                 By s/Kristen Castaneda
                                        Case Manager